# EXHIBIT 2

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
# CIVIL DIVISION—CIVIL ACTIONS BRANCH

| | | |
|---|---|---|
| ROSE'S 1, LLC, et al., | * | |
| | * | |
| Plaintiffs, | * | Civil Case No. 2020 CA 002424 B |
| | * | Civil II, Calendar I |
| v. | * | Judge Kelly A. Higashi |
| | * | |
| ERIE INSURANCE EXCHANGE, | * | |
| | * | |
| Defendant. | * | |

## ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Motion") and Defendant's Cross-Motion for Summary Judgment ("Defendant's Motion"). While the Court is sympathetic to the plight of Plaintiffs, it must grant summary judgment to Defendant as a matter of law.

## I. FACTS

Plaintiffs own and operate a number of prominent restaurants in the District of Columbia. They all purchased "Ultrapack Plus Commercial Property Coverage" from Defendant Erie Insurance Exchange. Included in this policy is coverage for "loss of 'income' and/or 'rental income'" sustained "due to partial or total 'interruption of business' resulting directly from 'loss' or damage" to the property insured. Rose's 1 Ultrapack Plus Commercial Property Coverage ("Coverage") at 3. The coverage document further states that the "policy insures against direct physical 'loss'" with the exception of several exclusions that are not relevant to this matter. *Id.* at 4.

This case comes in the context of the COVID-19 pandemic. COVID-19 is "a novel severe acute respiratory illness that has killed … more than 100,000 nationwide. At this time, there is no known cure, no effective treatment, and no vaccine. Because people may be

infected but asymptomatic, they may unwittingly infect others." *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring). On March 11, 2020, D.C. Mayor Muriel Bowser declared a state of emergency and a public health emergency due to the "imminent hazard of or actual occurrence of widespread exposure" to COVID-19. Plaintiffs' Statement of Material Facts ("SMF") ¶3. On March 16, Mayor Bowser issued an order prohibiting table seating at restaurants and bars in D.C. SMF ¶4. On March 20, Mayor Bowser extended this ban to "standing customers at restaurants, bars, taverns, and multi-purpose facilities." SMF ¶5. On March 24, Mayor Bowser ordered the closure of all non-essential businesses. SMF ¶6. On March 30, she ordered all D.C. residents to stay in their residences except for limited "essential" reasons, a restriction that continued for several months. SMF ¶¶7-8.

As a result of Mayor Bowser's orders, the restaurant Plaintiffs were forced to close their businesses and suffered serious revenue losses. SMF ¶¶21-22. To cover those losses, they filed insurance claims with Defendant pursuant to insurance policies that "are substantively identical in all ways relevant to this action." SMF ¶78. When Defendant denied their claims, Plaintiffs filed this lawsuit seeking a declaratory judgment that their claims were covered by the express language of their insurance contracts with Defendant. Both sides subsequently moved for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

D.C. Superior Court Rule of Civil Procedure 56 allows a court to grant summary judgment to a party when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. D.C. Super. Ct. Civ. R. 56(a); *Perkins v. District of Columbia*, 146 A.3d 80, 84 (D.C. 2016). In considering a motion for summary judgment, the

court must view the evidence "in the light most favorable to the nonmoving party, who is entitled to all favorable inferences which may reasonably be drawn from the evidentiary materials." *Phelan v. City of Mt. Rainier*, 805 A.2d 930, 936 (D.C. 2002) (internal quotation marks omitted). The Court "may not resolve issues of fact or weigh evidence at the summary judgment stage." *Fry v. Diamond Construction, Inc.*, 659 A.2d 241, 245 (D.C. 1995) (internal quotation marks omitted). Even if no material dispute of fact exists, the moving party must still establish that it is entitled to judgment as a matter of law. D.C. Super. Ct. Civ. R. 56(a).

## III. ANALYSIS

Under District of Columbia law, "[c]ontract principles are applicable to the interpretation of an insurance policy." *Carlyle Inv. Mgmt. LLC v. Ace Am. Ins. Co.*, 131 A.3d 886, 894 (D.C. 2016). "The proper interpretation" of an insurance contract, "including whether [the] contract is ambiguous, is a legal question." *Id.* (internal quotation mark omitted) (quoting *Tillery v. D.C. Contract Appeals Bd.*, 912 A.2d 1169, 1176 (D.C. 2006)). "[A]n insurance policy is to be . . . enforced in accordance with the real intent of the parties as expressed in the language employed in the policy." *Redmond v. State Farm Ins. Co.*, 728 A.2d 1202, 1205 (D.C. 1999) (internal quotation marks omitted) (quoting *Peerless Ins. Co. v. Gonzalez*, 697 A.2d 680, 682 (Conn. 1997)). A court must "give the words used in an insurance contract their common, ordinary, and . . . popular meaning," *Id.* (omission in original) (internal quotation marks omitted) (quoting *Quadrangle Dev. Corp. v. Hartford Ins. Co.*, 645 A.2d 1074, 1075 (D.C. 1994)), and must interpret the contract "as a whole, giving reasonable, lawful, and effective meaning to all its terms, and ascertaining the meaning in light of all the circumstances surrounding the parties at the time the contract was made," *Carlyle Inv. Mgmt.*, 131 A.3d at 895 (internal quotation mark omitted) (quoting *Debnam v. Crane Co.*, 976 A.2d 193, 197 (D.C. 2009)).

3

"[I]f the provisions of the contract are ambiguous, the correct interpretation becomes a question for a factfinder." *Carlyle Inv. Mgmt.*, 131 A.3d 886 at 895 (internal quotation marks omitted) (quoting *Debnam*, 976 A.2d at 197-98). "Where," however, "insurance contract language is not ambiguous, summary judgment is appropriate because a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence." *Fogg v. Fidelity Nat. Title Ins. Co.*, 89 A.3d 510, 514 (D.C. 2014) (internal quotation marks omitted) (quoting *Stevens v. United Gen. Title Ins. Co.*, 801 A.2d 61, 66 (D.C. 2002)). Indeed, the Court "should not seek out ambiguity where none exists." *Athridge v. Aetna Cas. & Sur. Co.*, 351 F.3d 1166, 1172 (D.C. Cir. 2003) (citing *Medical Serv. of Dist. of Columbia v. Llewellyn*, 208 A.2d 734, 736 (D.C. 1965)).

At the most basic level, the parties dispute whether the closure of the restaurants due to Mayor Bowser's orders constituted a "direct physical loss" under the policy. Plaintiffs start with dictionary definitions to support their case. For example, they cite the American Heritage Dictionary definition of "direct" as "[w]ithout intervening persons, conditions, or agencies; immediate." Plaintiffs' Motion at 9-10. They also cite the Oxford English Dictionary definition of "physical" as pertaining to things "[o]f or pertaining to matter, or the world as perceived by the senses; material as [opposed] to mental or spiritual." *Id*. at 10. As for "loss," it is defined by the coverage document as "direct and accidental loss of or damage to covered property." Coverage at 36.

Plaintiffs use these definitions to make three primary arguments. *First*, Plaintiffs argue that the loss of use of their restaurant properties was "direct" because the closures were the direct result of the mayor's orders without intervening action. Plaintiffs' Motion at 9-10. But those orders were governmental edicts that commanded individuals and businesses to take certain

4

actions. Standing alone and absent intervening actions by individuals and businesses, the orders did not effect any direct changes to the properties.

*Second*, Plaintiffs argue that their losses were "physical" because the COVID-19 virus is "material" and "tangible," and because the harm they experienced was caused by the mayor's orders rather than "some abstract mental phenomenon such as irrational fear causing diners to refrain from eating out." Plaintiffs' Motion at 11. But Plaintiffs offer no evidence that COVID-19 was actually present on their insured properties at the time they were forced to close. And the mayor's orders did not have any effect on the material or tangible structure of the insured properties.

*Third*, Plaintiffs argue that by defining "loss" in the policy as encompassing either "loss" or "damage," Defendant must treat the term "loss" as distinct from "damage," which connotes physical damage to the property. Plaintiffs' Motion at 11-12. In contrast, Plaintiffs argue, "loss" incorporates "loss of use," which only requires that Plaintiffs be deprived of the use of their properties, not that the properties suffer physical damage. *Id*. at 12-13. But under a natural reading of the term "direct physical loss," the words "direct" and "physical" modify the word "loss." As such, pursuant to Plaintiffs' dictionary definitions, any "loss of use" must be caused, without the intervention of other persons or conditions, by something pertaining to matter—in other words, a direct physical intrusion on to the insured property. Mayor Bowser's orders were not such a direct physical intrusion.

Further, none of the cases cited by Plaintiffs stand for the proposition that a governmental edict, standing alone, constitutes a direct physical loss under an insurance policy. In *Gregory Packaging, Inc. v. Travelers Property Casualty Co. of America*, the court found that the release of ammonia into a juice cup packaging factory was a "direct physical loss" because it constituted

"an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event *directly upon the property* causing it to become unsatisfactory for future use or requiring that repairs be made to make it so." 2014 U.S. Dist. LEXIS 165232 at *13-19 (D.N.J. Nov. 25, 2014) (quoting *AFLAC Inc. v. Chubb & Sons, Inc.*, 260 Ga. App. 306, 319-20 (Ga. Ct. App. 2003)) (internal quotation marks omitted) (emphasis added). Similarly, in *Western Fire Insurance Co. v. First Presbyterian Church*, the Colorado Supreme Court found a "direct physical loss" when gasoline fumes from an unknown source entered an insured church and the fire department ordered the church's closure. 437 P.2d 52, 55 (Colo. 1968). The court based its reasoning on the fact that the church "became so infiltrated and saturated as to be uninhabitable, making further use of the building highly dangerous." *Id.* At the same time, the Court noted that "[i]t is perhaps quite true" that the fire department's closure order, "*standing alone*, does not in and of itself constitute a 'direct physical loss.'" *Id*. (emphasis added). All of the other cases cited by Defendant involved some compromise to the physical integrity of the insured property. *See Port Authority v. Affiliated FM Insurance Co.*, 311 F.3d 226, 236 (3d Cir. 2002) (presence of asbestos in building was not "physical loss" because building owner could not show real or imminent "contamination of the property such that its function is nearly eliminated or destroyed, or the structure is made useless or uninhabitable"); *Motorists Mut. Ins. Co. v. Hardinger*, 131 Fed. Appx. 823, 826-27 (3d Cir. 2005) (presence of bacterium on property could constitute "direct physical loss" if it "reduced the use of the property to a substantial degree"); *TRAVCO Insurance Co. v. Ward*, 715 F. Supp. 2d 699, 709-10 (E.D. Va. 2010), *aff'd* 504 F. Appx. 251 (4th Cir. 2013) (home rendered uninhabitable by toxic gases released by defective drywall constituted "direct physical loss"); *Mellin v. Northern Security Insurance Company, Inc.*, 115 A.3d 799, 805 (N.H. 2015) (cat urine odor from neighboring apartment may constitute "direct

physical loss" if plaintiff could show "distinct and demonstrable alteration to the unit"); *Murray v. State Farm Fire & Casualty Co.*, 509 S.E.2d 1, 16-17 (W.Va. 1998) (landslide rendering homes uninhabitable, due to either actual physical damage or palpable future risk of physical damage from a follow-on landslide, was a "direct physical loss"); *Sentinel Management Co. v. New Hampshire Insurance Co.*, 563 N.W.2d 296, 300-01 (Minn. Ct. App. 1997) (asbestos contamination in building was "direct physical loss" when "property rendered useless").

In contrast, courts have rejected coverage when a business's closure was not due to direct physical harm to the insured premises. In *Roundabout Theatre Co. v. Continental Casualty Co.*, the City of New York ordered the closure of a theater after a portion of a neighboring building under construction collapsed onto the street and adjacent buildings. 302 A.D.2d 1, 2-3 (N.Y. App. Div. 2002). The theater itself sustained minor damage that was repaired in one day. *Id.* at 3. Nonetheless, the court found that the theater did not suffer a "direct physical loss" as a result of the city-mandated closure. *Id.* at 7. It found that "[t]he plain meaning of the words 'direct' and 'physical'" narrowed the scope of coverage and mandated "the conclusion that losses resulting from off-site property damage do not constitute covered perils under the policy." *Id.* Similarly, in *Newman Myers Kreines Gross, P.C. v. Great Northern Insurance Co.*, a federal district court found that a law firm did not suffer a "direct physical loss" when an electric utility preemptively shut off power in advance of Hurricane Sandy. 17 F. Supp. 3d 323 (S.D.N.Y. 2014). The court distinguished the cases cited by the law firm (several of which were also cited by Plaintiffs in this case) as either "involv[ing] the closure of a building due to either a physical change for the worse in the premises … or a newly discovered risk to its physical integrity." *Id.* at 330. Citing *Roundabout*, the Court reasoned:

> The critical policy language here—"direct physical loss or damage"—similarly, and unambiguously, requires some form of actual, physical damage to the insured premises to

7

> trigger loss of business income and extra expense coverage. Newman Myers simply cannot show any such loss or damage to the 40 Wall Street Building as a result of either (1) its inability to access its office from October 29 to November 3, 2012, or (2) Con Ed's decision to shut off the power to the Bowling Green network. The words "direct" and "physical," which modify the phrase "loss or damage," ordinarily connote actual, demonstrable harm of some form to the premises itself, rather than forced closure of the premises for reasons exogenous to the premises themselves, or the adverse business consequences that flow from such closure.

*Id.* at 331; *see also United Airlines, Inc. v. Insurance Co. of State of Pa.*, 385 F. Supp. 2d 343, 349 (S.D.N.Y. 2005), *aff'd* 439 F.3d 128 (2d Cir. 2006) ("The inclusion of the modifier 'physical' before 'damages' . . . supports [defendant's] position that physical damage is required before business interruption coverage is paid."); *Philadelphia Parking Auth. v. Federal Insurance Co.*, 385 F. Supp. 2d 280, 287-88 (S.D.N.Y. 2005) (noting that "'direct physical' modifies both loss and damage," and therefore "the interruption in business must be caused by some physical problem with the covered property . . . which must be caused by a 'covered cause of loss'").

While the Court can find no published cases in this jurisdiction analyzing the exact term "direct physical loss," cases addressing similar issues do not help Plaintiffs. Most relevantly, in *Bros., Inc. v. Liberty Mutual Fire Insurance Co.*, the District of Columbia Court of Appeals considered whether a restaurant could recover on its claim after it lost business due to a curfew imposed by the D.C. government as a result of the riots following the assassination of Dr. Martin Luther King, Jr. in 1968. 268 A.2d 611 (D.C. 1970). The insurance contract included this relevant language:

> In consideration of the premium for this coverage shown on the first page of this policy [Building and Contents] . . . the coverage of this policy is extended to include direct loss by . . . Riot . . . [and] Civil Commotion . . . .
>
> When this Endorsement is attached to a policy covering Business Interruption, . . . the term "direct," as applied to loss, means loss, as limited and conditioned in such policy, *resulting from direct loss to described property from perils insured against*; . . . .

8

*Id*. at 613 (emphasis in original).[1]  The Court of Appeals interpreted the term "direct loss" in the contract to mean "a loss proximately resulting from physical damage to the property or contents caused by a riot or civil commotion." *Id*.  Under that definition, the Court found that the restaurant was unable to recover, since, "at the most," the restaurant's lost business due to the curfew "was an indirect, if not remote, loss resulting from riots" and there was no "physical damage to the property." *Id.*  Accordingly, while the Court agrees with Plaintiffs that *Bros., Inc.* is not directly on point, the case does support the proposition that, in the context of property insurance, the term "direct loss" implies some form of direct physical change to the insured property.

With both dictionary definitions and the weight of case law supporting Defendant's interpretation of the term "direct physical loss," Plaintiffs' additional arguments are unconvincing.  First, Plaintiffs argue that because the insurance contract has specific exclusions for "loss of use" under some coverage lines but not for Income Protection coverage, the Court should infer that the Income Protection coverage covers losses such as Plaintiffs'.  Plaintiffs' Motion at 13-14.  But as already discussed, even if "loss of use" was covered, Plaintiffs would still have to show that the loss of use was a "direct physical loss" similar to those in the cases discussed *supra* at 5-7.  And for the reasons explained in this order, there was no "direct physical loss" to Plaintiffs.  Second, Plaintiffs argue that, unlike some similar insurance policies, their policies do not include a specific exclusion for pandemic-related losses. *Id.* at 19-20.  But again,

---

[1] This Court notes that the phrase at issue in the *Bros., Inc.* contract was "direct loss," as opposed to "direct physical loss," at issue in the present case, and that in the *Bros., Inc.* case, there was an issue as to whether the "Building and Contents" Form, which was mistakenly attached to the policy at the time of signing, or the "Business Interruption" Form, which the insurance company later substituted, was construed by the trial court.  However, the Court of Appeals found it "unnecessary to ascertain which of the two forms was construed by the trial court," 268 A.2d at 612, as the Court found that the insurance company prevailed under both forms.

even in the absence of such an exclusion, Plaintiffs would still be required to show a "direct physical loss." Because they cannot do so, the Court grants summary judgment to Defendant.

Accordingly, it is this **6th** day of **August, 2020**, hereby

**ORDERED** that Plaintiffs' Motion for Summary Judgment is **DENIED**; and it is further

**ORDERED** that Defendant's Cross-Motion for Summary Judgment is **GRANTED**; and it is further

**ORDERED** that judgment is **ENTERED** in favor of Defendant Erie Insurance Exchange and against Plaintiffs, the initial scheduling conference is **VACATED**, and the case is **CLOSED**.

	**Kelly A. Higashi**
	Associate Judge
	(Signed in Chambers)

**COPIES TO:**
David L. Feinberg
Michael C. Davis
George E. Reede, Jr.
Jessica Pak
*Via CaseFileXpress*