# EXHIBIT 3

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   SOCIAL LIFE MAGAZINE, INC.,

 4                  Plaintiff,                New York, N.Y.

 5              v.                             20 Civ. 3311(VEC)

 6   SENTINEL INSURANCE COMPANY
     LIMITED,
 7
                    Defendant.
 8
     ------------------------------x           Teleconference
 9                                             Order to Show Cause

10
                                               May 14, 2020
11                                             10:00 a.m.

12   Before:

13                   HON. VALERIE E. CAPRONI,

14                                 District Judge

15

16                          APPEARANCES

17

18   GABRIEL J. FISCHBARG
          Attorney for Plaintiff
19

20   STEPTOE & JOHNSON, LLP
          Attorneys for Defendant
21   BY:  CHARLES A. MICHAEL
          SARAH D. GORDON
22

23

24

25
```

1          THE COURT:  Good morning, everybody.
2          Do I have a court reporter on the line?
3          THE COURT REPORTER:  Good morning, your Honor.
4   Kristen Carannante.
5          THE COURT:  Good morning.
6          Okay.  Do I have Mr. Fischbarg for the plaintiff?
7          MR. FISCHBARG:  Yes, Judge.  Hi.
8          THE COURT:  Mr. Fischbarg, is anyone else on the line
9   for the plaintiff?
10         MR. FISCHBARG:  Yes.  The plaintiff is on a separate
11  phone available if you need evidence or --
12         THE COURT:  The principal of Social Life?
13         MR. FISCHBARG:  Yes.  He is in my office, you know,
14  more than six feet away, and --
15         THE COURT:  Okay.
16         And who do I have for the defendant?
17         MR. MICHAEL:  Good morning, your Honor.  This is
18  Charles Michael, from Steptoe & Johnson, for the defendant.
19  With me is my partner Sarah Gordon, who was just admitted *pro*
20  *hac vice*, and who will be doing the presentation today.
21         THE COURT:  Terrific.
22         All right --
23         MS. GORDON:  Good morning, your Honor.
24         THE COURT:  Good morning.
25         Only people who are speaking need to note their

appearances, and I have got those, Mr. Fischbarg and Ms. Gordon. Everybody else, please mute your telephone.

Also, if you hear that sound that sounds like someone has dropped off the line once we get started, I need you to stop talking so that I can make sure that I have still got the court reporter and your adversary on the line.

So, Mr. Fischbarg, this is your motion, so you get to go first.

MR. FISCHBARG: Yes. So I submitted a reply memorandum, you know, in the afternoon yesterday. I was just wondering if --

THE COURT: Yes. I saw that. Thank you.

MR. FISCHBARG: Okay, so you were also able to read it, I suppose?

THE COURT: Yes, yes.

MR. FISCHBARG: Okay.

So I guess the only other thing I want to add that's not in the papers, and then I don't know if your Honor has any issues that you want to talk about, is I mentioned that Liberty Mutual had this exclusion for viruses and it is also evident that other insurance companies have the same exclusion, including Travelers Insurance Company, and they filed the -- they actually filed a federal lawsuit for declaratory judgment in California, Docket No. 20 Civ. 3619, to preempt such claims, I guess to enforce their exclusion for viruses. So to the

1  extent that the defendant is claiming some kind of overreach by
2  the plaintiff here, I don't think it is proper.  There are
3  several insurance companies who are capable of putting in a
4  virus exclusion in their policies, and in this case there is
5  none.  So --
6          THE COURT:  Let me ask you something.  First off, I
7  want to start with basics.  Do you agree that New York law
8  applies?
9          MR. FISCHBARG:  Yes.
10         THE COURT:  All right.  So the -- is it the *Roundabout*
11 *Theatre* case?
12         MS. GORDON:  Yes, your Honor.
13         THE COURT:  First Department case?
14         MS. GORDON:  Yes, your Honor.  This is Ms. Gordon on
15 behalf of Sentinel.
16         THE COURT:  Thank you.
17         Mr. Fischbarg, it would seem to me that the *Roundabout*
18 case is a real problem for your position.
19         Would you like to explain to me why it doesn't
20 preclude your claim?
21         MR. FISCHBARG:  Yes.  That case applies to off-site
22 property damage rendering the premises at issue inaccessible.
23 So in this case, you don't have off-site property damage.  You
24 have on-site property damage.
25         THE COURT:  What is the damage?  There is no damage to

1 your property.

2     MR. FISCHBARG: Well, the virus exists everywhere.

3     THE COURT: It damages lungs. It doesn't damage
4 printing presses.

5     MR. FISCHBARG: Right. Well, that's a different
6 issue, whether or not -- that's a different issue than the
7 *Roundabout* case that had to do with accessibility. Now we are
8 jumping to the topic of whether a virus can cause physical
9 damage to a printing press, as your Honor mentioned. So that's
10 a separate issue, and there are a lot of cases that we have
11 cited where this type of material, a virus, does cause physical
12 damage.

13     THE COURT: What's your best case? What do you think
14 is your best case under New York law?

15     MR. FISCHBARG: Well, the problem is, under New York
16 law, there isn't much law. The New Jersey federal court, in
17 *TRAVCO*, citing other cases, including from other circuits,
18 where physical damage had a broader interpretation that
19 includes loss of use and not just, you know, something where
20 you take a hammer and break an item.

21     THE COURT: With loss of use, I mean, loss of use from
22 things like mold is different from you not being able to,
23 quote, use your premises because there is a virus that is
24 running amuck in the community.

25     MR. FISCHBARG: Okay. I would disagree with that. I

1  would say virus and mold are equivalent.  They are both
2  physical items which, if they land on a surface or are on a
3  surface, just like spores that are also listed in the policy,
4  mold is also listed in the policy.  I would say that the virus,
5  mold spores --
6             THE COURT:  Hang on --
7             MR. FISCHBARG:  -- anything --
8             THE COURT:  A second.
9             Do I still have the court reporter?
10            THE COURT REPORTER:  Yes, your Honor.
11            THE COURT:  Do I have I still have, Ms. Gordon?
12            MS. GORDON:  Yes, your Honor.
13            THE COURT:  All right.  Go ahead.
14            MR. FISCHBARG:  Mold spores, bacteria, virus, all
15 those are physical items which damage whatever they are on,
16 whatever they land on.  And in this case, the virus, when it
17 lands on something and you touch it, you could die from it.
18 So --
19            THE COURT:  That damages you.  It doesn't damage the
20 property.
21            MR. FISCHBARG:  But you are not able to use the
22 property because it damages you.  So it's a corollary.  In
23 other words, this policy, by the way, mentions the word "virus"
24 and "bacteria" in it in two places.
25            THE COURT:  Where does it mention it?

1          MR. FISCHBARG:  It mentions it in the PDF as well as
2    Exhibit 9, page 36 and 37, which is page 7 of 25 of the special
3    property coverage form under additional coverages, section
4    5(j), where the insured would cover certain law enforcement
5    orders requiring you to -- requiring remediation.  But it
6    contains an exclusion for bacteria and viruses, and it uses the
7    word "bacteria" and it uses the word "virus."
8          So what this is really referring to is the *Legionella*
9    bacteria, which is causes Legionnaires' disease typically.
10   That's the bacteria.  Virus is obviously something else.  So
11   this is obviously referring to when there is a Legionnaires'
12   outbreak in a building, which could happen in New York pretty
13   often, every few years, and then the building gets shut down
14   and they have to do remediation.  Either they -- at least as a
15   bacteria, *Legionella* bacteria only occurs in water or pipes or
16   in mist.  So the building is shut down, and then you might have
17   to -- and now there is a new code where the buildings have to
18   test their cooling systems for *Legionella* bacteria.  So that's
19   an example where a bacteria causes property loss, or loss of
20   use, or damage, physical damage to property.  And I would say
21   the virus is equivalent to that bacteria.  So --
22         THE COURT:  But it's not.  This is different.  The
23   virus is not specifically in your property that is causing
24   damage.  It is everywhere.  The Legionnaire example is very
25   different.  Because it's not like Legionnaire is running

1    rampant throughout the city, and therefore your office building
2    can get closed.  It is that the Legionnaire bacteria is in that
3    building causing --
4              MR. FISCHBARG:  Yes.
5              THE COURT:  -- that building to be shut down.
6              MR. FISCHBARG:  Yes.  Yes.
7              So this virus is everywhere, including this office in
8    particular, this office.  In other words, they just did a
9    random survey of people going into a grocery store in New York,
10   and 20 percent tested positive.  So, Judge, that's just a
11   one-sample test.  So if the infection rate in New York City is
12   20 percent, then the virus is literally everywhere.  So if
13   it --
14             THE COURT:  That's what --
15             MR. FISCHBARG:  -- is --
16             THE COURT:  That is what has caused the damage is that
17   the governor has said you need to stay home.  It is not that
18   there is any particular damage to your specific property.
19             MR. FISCHBARG:  Well, okay, that's --
20             THE COURT:  You may not even have the virus in your
21   property.
22             MR. FISCHBARG:  Well, okay, that's -- I would
23   disagree.  The virus not just causes -- it lands on equipment,
24   it lands everywhere.  That's why all of these -- all of the
25   health guidelines from the World Health Organization and

1  elsewhere talk about wearing gloves, talk about wiping things
2  down, because it lands on surfaces. It doesn't just get
3  transmitted through the air. Another way of getting it is
4  through contact --
5            THE COURT: Right, but what --
6            MR. FISCHBARG: -- when it touches your --
7            THE COURT: What evidence do you have that your
8  premises are infected with the COVID bug.
9            MR. FISCHBARG: Well, the plaintiff is here. He got
10 COVID. So that's evidence there.
11           THE COURT: Well, it's not evidence that he got it in
12 his office.
13           MR. FISCHBARG: Yes, but, okay, it's not -- we're
14 not -- I don't know what burden of proof we are looking at,
15 whether it is beyond a reasonable doubt --
16           THE COURT: No, it's --
17           MR. FISCHBARG: -- or more likely than not, more
18 likely than not, he can testify where he was and more likely
19 than not he either got it from his office or he got it from his
20 home. So that's a different burden of proof. If you are
21 looking for some kind of burden of proof to show that he got it
22 from his office, I mean, that's an evidentiary question, and we
23 can get an epidemiologist to testify and get an expert to
24 testify on that, which I understand is going to happen in the
25 other lawsuits that have been filed across the country

1 regarding --

2 THE COURT: Okay.

3 MR. FISCHBARG: -- this issue.

4 THE COURT: Okay.

5 MR. FISCHBARG: So . . .

6 THE COURT: Anything further, Mr. Fischbarg?

7 MR. FISCHBARG: No, I guess that's all for now. Thank
8 you.

9 THE COURT: Okay. Thanks.

10 Ms. Gordon.

11 MS. GORDON: Thank you, your Honor. This is Sarah
12 Gordon on behalf of Sentinel, and we agree with your Honor's
13 thoughts here.

14 The property policy has two distinct requirements
15 here. There has to be direct physical loss or physical damage
16 to the property and the cause of the business interruption
17 damages they are seeking has to be direct physical loss or
18 damage, and the cause here is not physical damage.

19 We think, you know, as your Honor rightly pointed out,
20 *Roundabout* controls. It is under New York law. It's a First
21 Department case from 2002. There are no subsequent decisions
22 that have disagreed or overturned it here in New York; and, if
23 anything, it has been confirmed by this . . .

24 THE COURT: Hang on. Did I lose my court reporter?

25 THE COURT REPORTER: No, Judge. I'm here.

1     THE COURT:  Did I lose Mr. Fischbarg?

2     MR. FISCHBARG:  No, I'm here.

3     THE COURT:  Okay.

4     MS. GORDON:  This court, your Honor, in *Newman Myers*, adopted the exact same rationale for a law firm that was trying to assert damages where there were no -- business interruption damages, where there was no physical harm to the property. And, you know --

9     THE COURT:  Let me interrupt you for a second.

So Judge Engelmayer in *Newman* went out of his way to talk about a case where there was a bunch of -- there was a rock slide which didn't actually hit the house or the premises, and yet they got coverage and coverage for the invasion of fumes.

15    MS. GORDON:  Yes, your Honor.

So for most of the cases, there are a number of them, there is -- what has happened is something physically has happened to the property that prevents people from being on the property.  So, for example, in *Gregory Packaging*, in New Jersey, there was ammonia leaked out and they couldn't be on the property, so something physically happened.  You couldn't necessarily see it or touch it, but there were fumes and it was unsafe to be there.  The same thing with *Motorists*, where there was *E. coli* in the well.  You couldn't be in that house because you were exposed to other things that had the *E. coli*.

1        The property has to be entirely unusable or
2   uninhabitable for physical loss or damage to constitute a loss
3   of use.  We don't think that's the law in New York in any
4   circumstance, but even in those other cases, there is nothing
5   equivalent here.  Mr. Fischbarg's client can go to his
6   premises.  There is no ammonia or mold or anything in the air
7   that's not going to allow him on to the property.  In fact, the
8   governor's orders explicitly allow him to go to the property
9   and get his mail or do routine business functions.  The only
10  rule is that he has to stay six feet apart from other people.
11  So those cases are entirely distinguishable.
12       And when a business, a property is allowed to remain
13  open or people can still occupy the premises, there is no
14  direct physical loss or damage.  That was the case -- that's
15  what the court said in *Port Authority*, that's what happened in
16  *Mama Jo's*, where the restaurant was allowed to be open.  The
17  cases where there is direct physical loss or damage, you
18  literally cannot be on the premises because there is something
19  there that is making it uninhabitable, and here that just isn't
20  true.
21       THE COURT:  Okay.  Mr. Fischbarg I will give you the
22  last word.
23       MR. FISCHBARG:  All right.  So I would disagree that
24  he is allowed to go to the premises.  In fact, the opposite is
25  true.  The executive order 202.8 says it requires 100 percent

1  reduction. So he can't go there, and he is not allowed to go
2  there, and that is a separate claim. It is the civil authority
3  claim besides the breach of contract claim.
4      THE COURT: Doesn't the executive order say -- I'm
5  sorry, which executive order are you talking about?
6      MR. FISCHBARG: It is . . .
7      It is Exhibit 3 of the declaration, and then on page
8  2, "Each employer shall reduce the in-person workforce at any
9  work locations by 100 percent no later than March 22 at 8p.m."
10 And then it says --
11     THE COURT: Right, but that doesn't mean the boss
12 can't go to the work location.
13     MR. FISCHBARG: I would say he is -- he is an employee
14 and he can't go. I think it does. In my building here in New
15 York, there is nobody here. I'm the only one. There is no
16 bosses in any of the offices.
17     THE COURT: There is nothing about the governor's
18 order that prohibits a small businessperson or a big
19 businessperson from going into their office to pick up mail, to
20 water the plants, to do anything like --
21     MR. FISCHBARG: Your Honor --
22     THE COURT: -- that, including employees that are
23 working.
24     MR. FISCHBARG: Sorry.
25     MS. GORDON: Your Honor, this is Sarah Gordon. Oh, go

1 ahead, Mr. Fischbarg.

2 MR. FISCHBARG: Okay.

3 Again, I would disagree. I think the order is pretty
4 clear that 100 percent means that you are not supposed to go to
5 work, and that's what people have been doing in New York. They
6 are not going into the office. And to the extent they are
7 getting mail, I mean, there is work-arounds where the workers
8 in the building have been leaving it downstairs for people to
9 pick up, but the way it's been implemented is that 100 percent
10 means no one is going to any office.

11 THE COURT: You are in your office.

12 MR. FISCHBARG: Yeah, I'm not -- I'm considered, by
13 the way -- lawyers are considered essential, and if you are a
14 sole practitioner, you are considered essential. So I have the
15 exclusion, and that's why I am here, but otherwise I wouldn't
16 be here. So . . .

17 MS. GORDON: Your Honor, if I may? We submitted with
18 Mr. Michael's affidavit, Exhibit D, a printout from the Empire
19 State Development website. And on question 13, it addresses
20 exactly this issue. It says, "What if my business is not
21 essential but a person must pick up mail or perform a similar
22 routine function each day?" And the answer provided by the
23 Empire State is, "A single person attending a nonessential
24 closed business temporarily to perform a specific task is
25 permitted so long as they will not be in contact with other

people."

    THE COURT:  I thought I had read that somewhere.

    MS. GORDON:  Yes.  It is in Mr. Michael's declaration, and I think it's ECF 18-4, page 304.

    THE COURT:  Okay.

    MR. FISCHBARG:  Right, but I think the executive order supersedes that is what I would argue.

    THE COURT:  Okay.

    Mr. Fischbarg, you have got to demonstrate a probability of success on the merits.  I feel bad for your client.  I feel bad for every small business that is having difficulties during this period of time.  But New York law is clear that this kind of business interruption needs some damage to the property to prohibit you from going.  You get an A for effort, you get a gold star for creativity, but this is just not what's covered under these insurance policies.

    So I will have a more complete order later, but your motion for preliminary injunction is going to be denied.

    Anything further for the plaintiff?

    MR. FISCHBARG:  I guess just a housekeeping thing.  We filed an amended complaint.  Are we going to deem it served or does it have to be re-served?

    THE COURT:  Has the defendant -- does the defendant want to be reserved or will you take the amended complaint?

    MR. MICHAEL:  Your Honor, this is Charles Michael.

1          We have entered a notice of appearance, and so I think
2     once they filed it on ECF, that service, we are happy to
3     consider it served.  That's fine.  And he does have one
4     amendment as of right.
5          THE COURT:  Correct.
6          MR. MICHAEL:  That was within his right to file it.
7          THE COURT:  Does defendant plan to move or answer?
8          MR. MICHAEL:  Probably to move.  We would have to
9     discuss it with our client, but I believe so.
10         THE COURT:  Okay.  What are the parties' position on
11    discovery while the motion to dismiss is pending?
12         MR. FISCHBARG:  Well, I would say there are two
13    motions filed -- there is one in the Eastern District of
14    Pennsylvania and one in, I think, the Northern District of
15    Illinois -- for an MDL, multi-district litigation, involving a
16    lot of lawsuits combining, so I think this might be happening
17    in each state until that motion is decided, and I think the
18    briefing schedule is in June --
19         MS. GORDON:  We -- your Honor --
20         MR. FISCHBARG:  -- so I think --
21         MS. GORDON:  Sorry, Mr. Fischbarg.
22         MR. FISCHBARG:  So I would say that this case might be
23    transferred to the multi-district panel at some point.
24         THE COURT:  Okay.  So, Mr. Fischbarg, what I am
25    hearing you say is that you are perfectly happy to have the

1    defendants not move until we find out whether or not your case

2    is going to get scooped up into the MDL?

3              MR. FISCHBARG:  Yes, correct.

4              THE COURT:  All right.  I presume that the defendants

5    are perfectly happy to do nothing until you hear back from the

6    MDL.

7              MS. GORDON:  Your Honor, I need to consult with my

8    client on that.  I'm not sure that that's true.  We don't think

9    these cases are appropriate for consolidation in the MDL for

10   many of the reasons which were evident today, given the

11   different states' conclusions on these laws.  So I need to

12   consult with my client on the motion practice.  We may intend

13   to want to move in any event.

14             THE COURT:  Okay.  Well, you could move, but if there

15   is a likely -- if there is some likelihood that they are going

16   to get scooped into the MDL, I'm not likely to decide it until

17   that decision is made.  So it is entirely -- I guess from my

18   perspective I don't really care, but from your client's

19   perspective, they may be making a motion to dismiss that's

20   unnecessary.  If you are right, and you may well be right, that

21   they are not going to MDL these kinds of cases, then all that's

22   happening is this is just being delayed into the summer for you

23   to incur fees making a motion to dismiss.

24             So why don't you talk to your client, figure out what

25   you want to do.  One way or the other, it does not seem to me

1  to make sense to proceed with discovery in this matter,
2  certainly under the circumstances that everyone is in, and
3  particularly the plaintiff is in, strapped for revenue, until
4  we figure out whether a lawsuit is going to go forward.
5      So talk to your client, figure out whether -- the
6  defendant should talk to Sentinel.  Figure out whether you are
7  happy staying this case pending a decision on the MDL or not,
8  and just write me a letter and let me know.
9      MS. GORDON:  Yes, your Honor.  Thank you.
10      MR. MICHAEL:  Your Honor --
11      THE COURT:  Anything further from the plaintiff?
12      MR. MICHAEL:  Just one housekeeping matter.  This is
13  Charles Michael, again, for the defendant.
14      THE COURT:  Okay.
15      MR. MICHAEL:  I just wondered if there was any special
16  procedures for ordering the transcript or if we go just through
17  the normal Southern District website?  I didn't know, under the
18  COVID circumstances, if there is something different we should
19  do.
20      THE COURT:  I don't think there is anything different,
21  but we have got the court reporter on.
22      So, Madam Court Reporter, is there anything different
23  they need to do?
24      THE COURT REPORTER:  At the end of this proceeding, I
25  am going to email the parties with their instructions.

k5e2SocH

1           THE COURT:  Okay.

2           MR. MICHAEL:  Terrific.  Thank you so much.

3           THE COURT:  Anything further from the plaintiff,

4 Mr. Fischbarg?

5           MR. FISCHBARG:  No.  Thank you, Judge.

6           THE COURT:  Anything further from the insurance

7 company?  Ms. Gordon?

8           MS. GORDON:  No.  Thank you, your Honor.

9           THE COURT:  All right.  Thank you, all.

10          MR. FISCHBARG:  Okay.  Bye, Judge.

11          MR. MICHAEL:  Thank you, your Honor.

12                         oOo

13

14

15

16

17

18

19

20

21

22

23

24

25

k5e2SocH

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300