# Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
                                      :

MICHAEL   CETTA,   INC.   d/b/a   SPARKS   STEAK :
HOUSE *on behalf of themselves and all others similarly* :
*situated*, :
                                        :

                        Plaintiff, :

                            :

                -v- :

ADMIRAL INDEMNITY COMPANY, :
                                        :

                      Defendant. :

---------------------------------------------------------------------X

20 Civ. 4612 (JPC)

<u>OPINION</u>
<u>AND ORDER</u>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/11/2020

JOHN P. CRONAN, United States District Judge:

      Plaintiff Michael Cetta, Inc. d/b/a Sparks Steak House ("Sparks") filed this putative class action alleging that Defendant Admiral Indemnity Company ("Admiral") breached its obligation to provide coverage for losses that resulted from governmental orders to close restaurants due to the COVID-19 outbreak.  Before the Court is Admiral's Motion to Dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6).  For reasons that follow, the Court grants the Motion to Dismiss.

## I.  Background

      The following factual allegations are taken from the Complaint.  In the present posture, the Court accepts the Complaint's allegations as true and draws all reasonable inferences in Sparks's favor.  *See Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009).  The Court at this stage may also consider statements or documents incorporated into the Complaint by reference, such as coverage provisions in the insurance contract at issue.  *See Kleinman v. Elan Corp.,* 706 F.3d 145, 152 (2d Cir. 2013); *La Vigne v. Costco Wholesale Corp.*, 284 F. Supp. 3d 496, 501 (S.D.N.Y. 2018).

### A.  The Insurance Policy

Sparks Steak House is a restaurant in Midtown Manhattan.  Complaint, Dkt. 1 ("Compl.") ¶ 14.  Sparks purchased an all-risk commercial property insurance policy from Admiral that ran from June 26, 2019 to June 26, 2020.  *Id.* ¶ 16; Defendant Admiral Indemnity Company's Memorandum of Law in Support of Its Motion to Dismiss the Complaint, Dkt. 25 ("Motion to Dismiss"), Exh. A ("Policy").  The Policy insured the restaurant against a wide range of losses.  Compl. ¶¶ 33-35.  Three of these coverage provisions are at the center of the instant dispute.  *Id.* ¶¶ 36-39.

The first is business income coverage.  In relevant part, this provision provides that:

> [Admiral] will pay for the actual loss of Business Income [the insured] sustain[s] due to the necessary "suspension" of [the insured's] "operations" during the "period of restoration".  The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations.  The loss or damage must be caused by or result from a Covered Cause of Loss.

Compl. ¶ 36; Policy at 56.  In other words, if Sparks had to shutter its doors because of a reason covered by the Policy, Admiral would pay for its operating expenses as well as the net income that the restaurant would have earned had it continued operating normally.  Compl. ¶ 36; Policy at 56. For example, assume that fire is a "covered cause of loss" under the Policy.  If a fire destroyed the restaurant, and Sparks was forced to close while the building was being repaired, Admiral would cover Sparks's expenses, like payroll, and lost income until the establishment was up and running again.  *See* Motion to Dismiss at 5.

The second type of coverage at issue here is extra expense coverage.  This is a tagalong to the first type of coverage; it only applies if business income coverage applies.  Compl. ¶ 38; Policy at 56.  The Policy defines "extra expense" as "necessary expenses [the insured] incur[s] during the

2

"period of restoration" that [the insured] would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss." Compl. ¶ 38; Policy at 56. This includes expenses to "[a]void or minimize the 'suspension' of business and to continue operations at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location" and "[m]inimize the 'suspension' of business if [the insured] cannot continue 'operations.'" Compl. ¶ 38; Policy at 56. Consider again the hypothetical fire that destroyed Sparks. In response to such a disaster, the eatery may decide to open a temporary location in Lower Manhattan while rebuilding its flagship Midtown restaurant. Extra expense coverage seemingly would require Admiral to fund many of the expenses Sparks incurred setting up the temporary Lower Manhattan location.

Finally, the Policy includes civil authority coverage, a special type of business income and extra expense coverage for certain governmental actions. It states:

> When a Covered Cause of Loss causes damage to property other than property at the described premises, [Admiral] will pay for the actual loss of Business Income [the insured] sustain[s] and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:
>
> > (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and
> >
> > (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Compl. ¶ 39; Policy at 57. This coverage works a bit differently than the first two because it does

not protect against property damage to Sparks directly.  Instead, it anticipates a situation in which damage to the area surrounding Sparks prevents access to Sparks.  For example, now imagine that a fire destroyed a neighboring building but left Sparks unscathed.  However, heavy smoke lingered on East 46th Street, which caused the fire department to shut down the entire block for a week until the smoke cleared.  With the block closed, the restaurant's employees could not go to work, and customers could not patronize the establishment.  An event such as this would seem to trigger civil authority coverage under the language of the Policy.

Besides these coverage provisions, the Policy also enumerates several exclusions, which identify situations that bar coverage in all circumstances.  Compl. ¶ 34; Policy at 68-72, 83.  Three are relevant to Admiral's Motion to Dismiss.  First is the "New York—Exclusion of Loss Due to Virus or Bacteria," which the Court refers to as the virus exclusion.  Compl. ¶ 41; Policy at 83.  This exclusion provides that Admiral "will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."  Compl. ¶ 41; Policy at 83.  This exclusion expressly applies to "forms or endorsements that cover business income, extra expense or action of civil authority."  Policy at 83.  Second, the ordinance or law exclusion bars coverage if the claim stems from "[t]he enforcement of any ordinance or law" that "[r]egulat[es] the construction, use or repair of any property."  *Id.* at 68.  Finally, the act or decision exclusion forbids coverage under the Policy for "[a]cts or decisions . . . of any person, group, organization or governmental body."  *Id.* at 71.

With this background of the Policy in mind, the Court now turns to the events of 2020 that ultimately led to the current dispute over the limits of the Policy's coverage.

**B.  The COVID-19 Pandemic**

COVID-19 is a novel coronavirus that began in Wuhan, China at the end of 2019 and

quickly spread around the world.  Compl. ¶¶ 17, 18, 20.  By late April 2020, the deadly virus had infected millions of people across the globe and had killed 40,000 Americans.  *Id.* ¶ 20.  While scientists have discovered several modes of human-to-human transmission of COVID-19, including through symptomatic, presymptomatic, and asymptomatic transmission, data from studies suggest that the virus is primarily transmitted from symptomatic people to other individuals through respiratory droplets and direct contact with infected persons.  *Id.* ¶ 22.  Some studies also have found that the virus "can live on contaminated objects or surfaces," thus suggesting that individuals could contract COVID-19 through contact with such surfaces.  *Id.* ¶¶ 25, 26, 28.

On March 11, 2020, the Director of the World Health Organization categorized the COVID-19 outbreak as a "pandemic."  *Id.* ¶ 1.  Two days later, President Donald J. Trump declared it a national emergency.  *Id.* ¶ 2.  The Centers for Disease Control and Prevention and members of the national Coronavirus Task Force soon issued guidance to prevent the spread of COVID-19. *Id.*  This guidance advised Americans to "adopt far-reaching social distancing measures, such as working from home, avoiding shopping trips and gatherings of more than ten people, and staying away from bars, restaurants, and food courts."  *Id.*

Following from this, many governmental entities around the country ordered what they deemed "non-essential" businesses to "suspend[] or severely curtail[] business operations" in order to "stop the spread of COVD-19 among the population."  *Id.* ¶¶ 3, 9.  The Complaint alleges that "almost all" States issued some form of a "stay-at-home" order and ordered private, "non-essential" businesses to close.  *Id.* ¶¶ 3, 29.  According to Sparks, these restrictions have been "catastrophic" for "non-essential businesses," especially restaurants.  *Id.* ¶ 4.  As of the filing of the Complaint, "all but one state ha[d] closed restaurants and bars for services other than take-out and delivery."  *Id.* ¶ 30.

New York did so through several executive orders, of which the Court takes judicial notice. *See, e.g.*, *Casey v. Odwalla, Inc.*, 338 F. Supp. 3d 284, 294 (S.D.N.Y. 2018) ("Courts may take judicial notice of public documents or matters of public record."); *Porrazzo v. Bumble Bee Foods, LLC*, 822 F. Supp. 2d 406, 411 (S.D.N.Y. 2011) ("[I]t is well-established that courts may take judicial notice of publicly available documents on a motion to dismiss."). On March 16, 2020, Governor Andrew M. Cuomo issued Executive Order 202.3, which stated that "[a]ny restaurant or bar in the state of New York shall cease serving patrons food or beverage on-premises effective at 8 pm on March 16, 2020, and until further notice shall only serve food or beverage for off-premises consumption." Declaration of Stephen A. Weiss in Support of Plaintiff's Memorandum in Opposition to Defendant's Rule 12(b)(6) Motion to Dismiss the Complaint, Dkt. 27, Exh. C. That same day, New York City Mayor Bill De Blasio issued Executive Order 100, which contained a similar directive. Motion to Dismiss, Exh. B § 7. Mayor De Blasio ordered that restaurants, bars, and similar establishments could remain open "for the sole purpose of providing take-out or delivery service," so long as they did not exceed "fifty percent of their occupancy or seating capacity while persons are waiting for take-out and that such persons follow social distancing protocols." *Id.* Together, these state and local executive orders, which the Court refers to as the closure orders, meant that restaurants in New York City could no longer serve patrons on their premises, but instead could allow customers only to place take-out orders. *See* Compl. ¶ 30. The Complaint alleges that, because of these restrictions, Sparks was "forced to close." *Id.* ¶ 46.[1]

### C. Procedural History

Sparks filed a claim for "business interruption losses" under its all-risk Policy with

---

[1] The Court recognizes that in the months after the filing of the Complaint, state and local authorities began to allow some on-premises dining at New York restaurants. However, these changes are irrelevant to the instant case because Sparks's claims relate to losses that allegedly incurred while the original closure orders were in place.

Admiral.  *Id.* ¶ 44.  In a letter dated April 17, 2020, Admiral denied Sparks coverage for three

reasons.  *Id.*  First, with regard to business income and extra expense coverage, Admiral claimed

that there was "no physical damage" to Sparks.  *Id.*  Second, as to civil authority coverage, Admiral

stated that the necessary prerequisites were not met.  *Id.*  And finally, Admiral denied all claims

because certain "exclusions and limitations in the [P]olicy" precluded coverage.  *Id.*

Sparks began the instant diversity action in this Court on June 16, 2020 with the filing of

the Complaint.  Dkt. 1.  The crux of the Complaint is that Admiral wrongly denied coverage

because the Policy covers "business losses and extra expenses, and related losses resulting from

actions taken by civil authorities to stop the human to human and surface to human spread of the

COVID-19 outbreak."  Compl. ¶ 10.  Sparks brought this suit as a putative class action on behalf

of itself and "[a]ll entities" that (1) "suffered losses due to measures put in place by civil

authorities' stay-at-home or shelter-in-place orders since March 15, 2020"; and (2) purchased from

Admiral a standard all-risk commercial property insurance policy that provided for business

income losses and extra expenses, and did not exclude coverage for pandemics.  *Id.* ¶ 50.

The Complaint pleads three counts of declaratory judgment and three counts of breach of

contract.  *Id.* ¶¶ 62-108.  Counts One, Three, and Five each seek a declaratory judgment that

Admiral is obligated to pay Sparks under the business income, civil authority, and extra expense

coverage provisions, respectively.  *Id.* ¶¶ 68, 85, 100.  Each of these counts seeks a declaratory

judgment covering losses already incurred and losses to be incurred in connection with the closure

orders.  *Id.*  Counts Two, Four, and Six allege that Admiral breached its obligations under the

Policy when it denied Sparks coverage under these same coverage provisions.  *Id.* ¶¶ 77, 92, 107.

On September 9, 2020, Admiral filed its Motion to Dismiss.  Dkt. 24.  Admiral argues that

Sparks is not entitled to business income or extra expense coverage because Sparks did not suffer

"direct physical loss of or damage to" property, and that Sparks failed to plead entitlement to civil authority coverage because the closure orders were not the result of physical damage near the restaurant and did not prohibit access to the restaurant.  Motion to Dismiss at 13-23.  Admiral also argues that several exclusions bar coverage in all events.  *Id.* at 8-13.  Sparks opposed the motion on October 7, 2020, Dkt. 26, and Admiral replied on October 21, 2020, Dkt. 29.  Because the Court holds that Sparks failed to plead that it met the requirements for the three types of coverage at issue, the Court does not reach whether the virus or other exclusions apply here.

## II.  Discussion

### A.  Legal Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  A complaint's "[f]actual allegations must be enough to raise the right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

### B.  Choice of Law

The parties do not directly address choice of law, but they apply New York law in their briefs.  *See* Motion to Dismiss at 7, 10, 19; Plaintiff's Memorandum in Opposition to Defendant's Rule 12(b)(6) Motion to Dismiss the Complaint, Dkt. 26 ("Opposition") at 8, 9-10, 12; Defendant Admiral Indemnity Company's Reply Memorandum in Further Support of Its Motion to Dismiss the Complaint, Dkt. 29, at 8.  It is clear that New York law governs.

Jurisdiction exists here pursuant to 28 U.S.C. § 1332 because the named Plaintiff and

Defendant are diverse and the necessary amount in controversy is met. *See* Compl. ¶¶ 12-15. Federal courts sitting in diversity must apply the choice-of-law rules of the State in which they reside. *See Md. Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 151 (2d Cir. 2003). "New York courts seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute." *Brink's Ltd. v. S. African Airways*, 93 F.3d 1022, 1030 (2d Cir. 1996). In contract disputes, New York courts apply a "center of gravity" approach in which courts may "consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." *AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 135 (2d Cir. 2018) (quoting *Brink's Ltd.*, 93 F.3d at 1030-31).

Sparks is a New York corporation with its principal place of business in New York. Compl. ¶ 14. New York state and local closure orders are at the center of the allegations. *Id.* ¶ 46; Motion to Dismiss at 22; Opposition at 5. Because the Court finds that New York is the jurisdiction with the most significant interest in this dispute, the Court will apply New York law.

**C. Business Income Coverage**

Sparks first claims that it is entitled under the Policy to business income coverage due to losses incurred as a result of the closure orders. Compl. ¶¶ 68, 75. One requirement of this coverage is that the "suspension" of the restaurant's operation "must be caused by direct physical loss of or damage to property" at the premises. Policy at 56. The Policy defines "suspension" as "[t]he slowdown or cessation of [the insured's] business activities," *id.* at 67, and Admiral does not contest that Sparks's business was suspended due to the closure orders. The question for this Court is thus whether that suspension was "caused by direct physical loss of or damage to" Sparks's property. If it was not, this provision does not provide coverage for Sparks's claimed

losses.

The Complaint does not allege that any of Sparks's property was physically lost or damaged, as those terms are commonly understood. Instead, it alleges that Sparks "suffered a direct physical loss of and damage to [its] property because [it has] been unable to *use* [its] property for its intended purpose" due to the closure orders. Compl. ¶ 42 (emphasis added). Sparks's core theory is thus that its inability to fully use its restaurant satisfies the loss or damage to property prerequisite of the business income coverage provision. Opposition at 9 (arguing that the phrase "'loss of property' should be interpreted to include the loss of use of property"). The Court does not agree.

Under New York law, "a policyholder bears the burden of showing that the insurance contract covers the loss." *Morgan Stanley Grp. Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 276 (2d Cir. 2000). "The initial interpretation of a contract is a matter of law for the court to decide." *Id.* at 275 (internal quotation marks, alteration, and citation omitted). "Insurance contracts must be interpreted according to common speech and consistent with the reasonable expectation of the average insured." *Dean v. Tower Ins. Co. of N.Y.*, 19 N.Y.3d 704, 708 (2012). Courts must "give effect to the intent of the parties as expressed in the clear language of the contract," *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (internal quotation marks and citation omitted), giving "unambiguous provisions of an insurance contract . . . their plain and ordinary meaning," *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 567 (2d Cir. 2011) (internal quotation marks and citation omitted). *See Essex Ins. Co. v. Laruccia Constr., Inc.* 898 N.Y.S.2d 558, 559 (App. Div. 2010). "If the provisions are clear and unambiguous, courts are to enforce them as written." *Vill. of Sylvan Beach, N.Y. v. Travelers Indem. Co.*, 55 F.3d 114, 115 (2d Cir. 1995). If provisions are ambiguous, courts must construe

10

them in the insured's favor and against the insurer.  *Dean*, 19 N.Y.3d at 708.

Accordingly, to ascertain the scope of the Policy's business income coverage, the Court starts with the text of the relevant provision.  Once again, the operative language states that the suspension of Sparks's operations "must be caused by direct physical loss of or damage to property."  Policy at 56.  The Business Income (and Extra Expense) Coverage Form contained in the Policy does not define any of these words.  *See id.* at 66-67.  But "the lack of a definition" of course does not render a word ambiguous.  *Lend Lease (US) Const. LMB Inc. v. Zurich Am. Ins. Co.*, 22 N.Y.S.3d 24, 29 (App. Div. 2015).  Instead, it is appropriate to turn to dictionary definitions.  *See Fed. Ins. Co.*, 639 F.3d at 567 ("[I]t is common practice for the courts of [New York] State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract.") (alterations in original) (quoting *10 Ellicott Square Ct. Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 120 (2d Cir. 2011)); *Lend Lease*, 22 N.Y.S.3d at 29.

Because Sparks's "loss of use" theory centers on the word "loss," the Court must home in on that word's meaning in the Policy.  In the relevant portion of the Policy, the term "loss" is modified by the word "physical".  Compl. ¶ 36; Policy at 56.  "Physical" means "[o]f, relating to, or involving material things; pertaining to real, tangible objects."  *Physical*, Black's Law Dictionary (11th ed. 2019).  While Black's Law Dictionary provides several definitions for the word "loss," only one could apply to physical objects: "[t]he failure to maintain possession of a thing."  *Loss*, Black's Law Dictionary (11th ed. 2019).  Putting these definitions together demonstrates that the "requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude [from property insurance] alleged losses that are intangible or incorporeal."  10A Couch on Ins. § 148:46 (3d ed. 2005).

The plain meaning of the phrase "direct physical loss of or damage to" therefore connotes

a negative alteration in the tangible condition of property.  *See, e.g.*, *Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323, 331 (S.D.N.Y. 2014) (holding that the phrase "direct physical loss or damage" "unambiguously[] requires some form of actual, physical damage to the insured premises"); *Phila. Parking Auth. v. Fed. Ins. Co.*, 385 F. Supp. 2d 280, 288 (S.D.N.Y. 2005) (holding that the phrase "physical loss or damage" requires that "the interruption in business must be caused by some physical problem with the covered property"); *see also Mark's Engine Co. No. 28 Rest., LLC v. Travelers Indem. Co. of Conn.*, 20 Civ. 4423, 2020 WL 5938689, at *4 (C.D. Cal. Oct. 2, 2020) (noting that an interpretation of the phrase "direct physical loss of" to include "deprivation of property without physical change in the condition of the property" would lack "manageable bounds") (internal quotation marks omitted).  Losing the ability to use otherwise unaltered or existing property simply does not change the physical condition or presence of that property and therefore cannot be classified as a form of "direct physical loss" or "damage."  *See* 10A Couch on Ins. § 148:46 (3d ed. 2005) (explaining that property insurance claims are precluded "when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable physical alteration of the property").

The idea that "loss of use" does not constitute a "direct physical loss of or damage to" property resonates in ordinary experience outside the context of insurance coverage.  Say, for example, a teenager broke curfew, and his parents punished him by taking away the keys to his car.  The teen undoubtedly lost the ability to use the car.  However, we would not say that there had been a "direct physical loss of or damage to" the car.  The teenager was precluded from driving it.  But the car's physical condition remained unchanged, and its presence likely remained at the residence.  Similarly, imagine a fisherman visits a public pond each day to cast his line.  One morning he arrived and found that the pond was closed for fishing because a nearby town was

hosting its annual swim race.  Did the fisherman lose the use of the pond for the day?  Yes.  He could not enjoy the premises for his intended use (*i.e.*, to fish).  But could anyone reasonably conclude there was a "direct physical loss of or damage to" the pond because he could not fish?  No.  The condition of the pond was not altered physically.

Reading the phrase "direct physical loss of or damage to" in the broader context of the Policy supports this interpretation as well.  Recall that business income coverage runs for the "period of restoration."  Policy at 56.  Sparks describes this period as running "until business is resumed," Opposition at 3, but this is not accurate.  Instead, the term "period of restoration" (unlike "loss" or "damage") is defined in the Business Income (and Extra Expense) Coverage Form as ending on the earlier of: "(1) [t]he date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or (2) [t]he date when business is resumed at a new permanent location."  Policy at 66.[2]  The idea that the premises will be "repaired, rebuilt or replaced" suggests the occurrence of material harm that then requires a physical fix.  *See Phila. Parking Auth.*, 385 F. Supp. 2d at 287 ("'Rebuild,' 'repair,' and 'replace' all strongly suggest that the damage contemplated by the Policy is physical in nature.").  Indeed, "[t]he words 'repair' and 'replace' contemplate physical damage to the insured premises as opposed to loss of use of it."  *Newman Myers*, 17 F. Supp. 3d at 332.

Sparks's reading of the Policy—that "loss of use" is covered—additionally would render the two possible end dates of the "period of restoration" provision meaningless when applied to

---

[2] Both parties cite the definition of "period of restoration" that is included on the form.  *See* Motion to Dismiss 15 n.4; Opposition at 3.  However, it appears that a different definition may be applicable to the Policy here.  *See* Policy at 110.  This alternative definition adds a third possible end date for the "period of restoration": "The date at the end of [actual loss sustained]-12 Months consecutive months after the direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises."  *Id.*  The parties do not rely on this, and the Court does not see how this possible alternative end date would change the above analysis.

circumstances like those presented in this case.  *See Roundabout Theater Co. v. Cont'l Cas. Co.*, 751 N.Y.S.2d 4, 9 (App. Div. 2002).  The alleged loss of use here requires no physical repair or rebuilding to end the suspension of Sparks's operations.  *Cf. Sandy Point Dental, PC v. Cincinnati Ins. Co.*, No. 20 Civ. 2160, 2020 WL 5630465, at *2 (N.D. Ill. Sept. 21, 2020) ("Plaintiff need not make any repairs or change any part of the building to continue its business."); *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, No. 20 Civ. 3213, 2020 WL 5525171, at *4 (N.D. Cal. Sept. 14, 2020) ("[H]ere, there is nothing to fix, replace, or even disinfect for [plaintiff] to regain occupancy of its property . . . .").  And there is no suggestion that Sparks is considering opening a "new permanent location," Policy at 66, especially when its flagship Midtown restaurant has nothing physically wrong with it.  Thus, the reading that "gives effect to all provisions of the Policy" is that "direct physical loss or damage" requires "actual, physical damage to the insured premises." *Newman Myers*, 17 F. Supp. 3d at 332.

What the plain meaning of the business income coverage provision suggests is the correct interpretation, case law confirms.  This Court is bound to apply New York law "as interpreted by New York's intermediate appellate courts" unless there is "persuasive evidence that the New York Court of Appeals, which has not ruled on this issue, would reach a different conclusion."  *Pahuta v. Massey-Ferguson, Inc.*, 170 F.3d 125, 134 (2d Cir. 1999).

The decision of the Appellate Division of the New York Supreme Court in *Roundabout Theater Co. v. Continental Casualty Co.* is on point.  There, a major construction accident occurred on the street outside a theater at which a popular musical was being staged.  751 N.Y.S.2d at 5. As a result of this accident, the City of New York closed the street.  *Id.*  The theater itself did not suffer any relevant damage, but it was forced to cancel nearly three dozen performances of the musical because the street was inaccessible to the public for several weeks.  *Id.*  The theater

claimed business interruption losses, the insurer denied coverage, and the theater sued.  *Id.* at 5-6.

The policy at issue in *Roundabout Theater* provided coverage for "loss of, damage to, or destruction of property or facilities . . . contracted by the insured for use in connection with such [p]roduction, caused by the perils insured against," and defined perils as "all risks of direct physical loss or damage to the [theater's] property."  *Id.* at 8.   Reading these provisions together, the Appellate Division held that the policy "clearly and unambiguously provide[d] coverage only where the insured's property suffers direct physical damage" and thus "the only conclusion that can be drawn is that the business interruption coverage is limited to losses involving physical damage to the insured's property."  *Id.*  The court rejected the theater's argument that "loss of" must include "loss of use of" the insured premises.  *Id.*  Therefore, because the theater did not suffer physical damage, it was not entitled to coverage.  *Id.* at 10.

Another court in this District applied *Roundabout Theater* to reject a similar claim that "loss of use" constitutes "direct physical loss or damage."  *Newman Myers*, 17 F. Supp. 3d at 325. In *Newman Myers*, a New York City law firm lost power for several days after Hurricane Sandy struck the New York region.  *Id.*  The law firm sued its insurer after it denied business income coverage.  *Id.* at 328.  The "decisive question" for the court was "whether the insured premises experienced 'direct physical loss or damage'" because the firm's employees could not access the office.  *Id.*  The court held that it did not and thus the firm was not entitled to business income coverage.  *Id.* at 333.  In reaching this holding, and citing *Roundabout Theater*, the court explained that "[t]he words 'direct' and 'physical,' which modify the phrase 'loss or damage,' ordinarily connote actual, demonstrable harm of some form to the premises itself, rather than forced closure of the premises for reasons exogenous to the premises themselves, or the adverse-business consequences that flow from such closure."  *Id.* at 331.  Further, the court explained it was

"unaware of authority supporting [the plaintiff's] argument that 'direct physical loss or damage' should be read . . . to extend to mere loss of use of a premises, where there has been no physical damage to such premises." *Id.*

As a result of COVID-19 closure orders throughout the country, many businesses have brought lawsuits claiming entitlement to coverage under provisions materially similar to those at issue in *Roundabout Theater*, *Newman Myers*, and here.  And nearly every court to address this issue has concluded that loss of use of a premises due to a governmental closure order does not trigger business income coverage premised on physical loss to property.  *See, e.g.*, *T & E Chicago LLC v. Cincinnati Ins. Co.*, No. 20 Civ. 4001, 2020 WL 6801845, at *5 (N.D. Ill. Nov. 19, 2020) (granting insurer's motion to dismiss because "loss of use of property without any physical change to that property cannot constitute direct physical loss or damage to the property"); *Long Affair Carpet & Rug, Inc. v. Liberty Mut. Ins. Co.*, No. 20 Civ. 1713, 2020 WL 6865774, at *3 (C.D. Cal. Nov. 12, 2020) (granting insurer's motion to dismiss because "there was no physical damage to [p]laintiff's business premises"); *Water Sports Kauai, Inc. v. Fireman's Fund Ins. Co.*, No. 20 Civ. 3750, 2020 WL 6562332, at *5-7 (N.D. Cal. Nov. 9, 2020) (granting insurer's motion to dismiss because loss of use did not constitute "direct physical loss of or damage to" property); *Real Hosp., LLC v. Travelers Cas. Ins. Co. of Am.*, No. 20 Civ. 87, 2020 WL 6503405, at *6 (S.D. Miss. Nov. 4, 2020) (granting insurer's motion to dismiss because the complaint failed to allege "that any insured property was damaged or that [p]laintiff was permanently dispossessed of any insured property"); *Raymond H Nahmad DDS PA v. Hartford Cas. Ins. Co.*, No. 20 Civ. 22833, 2020 WL 6392841, at *8 (S.D. Fla. Nov. 2, 2020) (granting insurer's motion to dismiss because the plaintiff failed to allege "any physical harm" to the property); *Uncork & Create LLC v. Cincinnati Ins. Co.*, No. 20 Civ. 401, 2020 WL 6436948, at *5 (S.D.W. Va. Nov. 2, 2020) (granting insurer's motion

to dismiss because "economic losses unaccompanied by physical property damage" did not constitute direct physical loss or damage to property); *Seifert v. IMT Ins. Co.*, No. 20 Civ.1102, 2020 WL 6120002, at *3 (D. Minn. Oct. 16, 2020) (granting insurer's motion to dismiss because the Governor of Minnesota's closure orders "prohibiting the use of property" were "not enough" to trigger coverage); *Henry's La. Grill, Inc. v. Allied Ins. Co. of Am.*, No. 20 Civ. 2939, 2020 WL 5938755, at *6 (N.D. Ga. Oct. 6, 2020) (granting insurer's motion to dismiss because the Governor of Georgia's closure orders "did not create a 'direct physical loss of' the [p]laintiffs' dining rooms"); *Mark's Engine*, 2020 WL 5938689, at *4 (granting insurer's motion to dismiss because the phrase "direct physical loss of" does not encompass "deprivation of property without physical change in the condition of the property"); *Infinity Exhibits, Inc. v. Certain Underwriters at Lloyd's London Known as Syndicate PEM 4000*, No. 20 Civ. 1605, 2020 WL 5791583, at *5 (M.D. Fla. Sept. 28, 2020) (granting insurer's motion to dismiss because "there is simply no coverage under the policies if they require 'direct physical loss of or damage' to property"); *Sandy Point Dental, PC*, 2020 WL 5630465, at *3 (granting insurer's motion to dismiss because the plaintiff's claim for coverage amounted to "financial losses as a result of the closure orders" which did not constitute a "direct physical loss"); *Turek Enters., Inc. v. State Farm Mut. Auto. Ins. Co.*, No. 20 Civ. 11655, 2020 WL 5258484, at *8 (E.D. Mich. Sept. 3, 2020) (granting insurer's motion to dismiss because the complaint did not allege "some tangible damage" to the property); *10E, LLC v. Travelers Indem. Co. of Conn.*, No. 20 Civ. 4418, 2020 WL 5359653, at *5 (C.D. Cal. Sept. 2, 2020) (granting insurer's motion to dismiss because "[a]n insured cannot recover by attempting to artfully plead temporary impairment to economically valuable use of property as physical loss or damage"); *Diesel Barbershop LLC v. State Farm Lloyds*, 20 Civ. 461, 2020 WL 4724305, at *5 (W.D. Tex. Aug. 13, 2020) (granting insurer's motion to dismiss because the plaintiffs failed to

plead a direct physical loss).[3]

Sparks's arguments to the contrary are unavailing.  First, Sparks attempts to get out from under this weight of authority by arguing that *Roundabout Theater*, *Newman Myers*, and many of the recent COVID-19 decisions from courts around the country were "wrongly decided" or "off base" because they treated the terms "loss of" and "damage to" as "coextensive."  Opposition at 12 & n.3.  This mischaracterizes this line of cases.  In fact, the Appellate Division rejected a similar argument in *Roundabout Theater*:

> The [lower] court's interpretation that the phrase 'loss of' must include 'loss of use of,' because otherwise 'loss of' would be redundant to 'destruction of,' is flawed.  Initially, as [defendant] points out, 'loss of' could refer to the theft or misplacement of theatre property that is neither damaged nor destroyed, yet still requires the cancellation of performances.

751 N.Y.S.2d at 8.

A close analysis of the text of the provision here confirms that the terms "loss" and "damage" are not superfluous.  First, as noted in *Roundabout Theater*, the term "loss" would seem to include "theft or misplacement," which would not constitute damage to the property.  *Id.* Further, "loss" would extend to the *complete* destruction of property, whereas "damage" contemplates a lesser injury.  *See Real Hosp., LLC*, 2020 WL 6503405, at *6 ("[I]n a restaurant with ten tables, there could be a fire, which completely burns up five of the tables—thus there [would be] a 'direct physical *loss* of property.'" (emphasis added)); *Henry's La. Grill*, 2020 WL

---

[3] One court in this District has addressed a related issue.  In *Social Life Magazine, Inc. v. Sentinel Insurance Co.*, No. 20 Civ. 3311 (VEC) (S.D.N.Y.), Dkt. 8-19, the plaintiff sought a preliminary injunction ordering the defendant insurance company to provide coverage for loss of business income resulting from COVID-19 closure orders.  In an oral ruling on May 14, 2020, the Honorable Valerie E. Caproni denied this motion.  *See* Motion to Dismiss, Exh. D at 15.  Judge Caproni noted that New York law requires "some damage to the property" and concluded that the plaintiff's claims, which were largely indistinguishable from those here, were "just not what's covered under these insurance policies."  *Id.*

5938755, at *5 ("As an illustrative example, a tornado that destroys the entirety of the restaurant results in a 'loss of' the restaurant, while a tree falling on part of the kitchen would represent 'damage to' the restaurant."). Thus, Sparks's argument that "direct physical loss of" then "*must* encompass loss of use," Opposition at 9 (emphasis added), is an untenable leap in logic.

Next, Sparks points to the Policy's commercial general liability section's definition of "property damage" as "[l]oss of use of tangible property that is not physically injured," Policy at 139, and argues that the Court should apply it to the business income coverage provision, Opposition at 9. But the business income coverage provision is not part of the commercial general liability section. It is a part of the Policy's commercial *property* section. *See* Policy at 27. Were the court nonetheless to use the commercial general liability section's definition of "property damage" to interpret a provision of the commercial property section, Sparks's "loss of use" argument would be bolstered. But the Court declines to do so.

Sparks's only rationale for applying this definition to the business income coverage provision is so that terms would have "consistent meaning when reading the Policy as a whole." Opposition at 9. However, the fact that the Policy includes several different definition sections counsels against this. *Compare* Policy at 66-67 (listing definitions for the business income coverage provision) *with* Policy at 137-40 (listing definitions for the commercial general liability section). This means that the same word or phrase may mean different things in different sections of the Policy. *Compare* Policy at 67 (defining "[o]ccurrence" as "all loss, damage or sequence of loss or damage, casualties or disasters arising from a single happening or event") *with* Policy at 139 (defining "[o]ccurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions"). While Sparks asks the Court to give terms in the Policy "consistent meaning," it is clear that the drafters of the Policy declined to do that.

The Court's reluctance to accept Sparks's argument here is further supported by the fact that the business income coverage and commercial general liability sections protect "wholly different interests." *Great N. Ins. Co. v. Mount Vernon Fire Ins. Co.*, 92 N.Y.2d 682, 688 (1999). As mentioned, business income coverage is found within the commercial property section of the Policy. Policy at 27. This is a type of "first-party" insurance that protects property interests. *Great N. Ins. Co.*, 92 N.Y.2d at 688. "[T]he goal of first-party property coverage . . . is to reimburse the insured for the insured's actual property loss, dollar for dollar, but no more." *Id.* On the other hand, the commercial general liability portion of the Policy is "third-party insurance," *id.*, which protects Sparks for claims it "becomes legally obligated to pay as damages," Policy at 125. *See Gap, Inc. v. Fireman's Fund Ins. Co.*, 782 N.Y.S.2d 242, 244 (App. Div. 2004) ("[T]he purpose of general liability insurance is to provide coverage for liability to third parties."). The Court sees no reason to cross wires between different definition sections of the Policy, especially when those sections protect entirely different interests.

Finally, Sparks points to a number of out-of-state cases for support of its argument that "an insured suffers a 'physical loss' if the structure is uninhabitable or unusable, even in the absence of physical damage." Opposition at 8. But these cases involve situations in which a plaintiff claimed that some harmful or unwanted substance entered its premises and made it impossible to use. They are therefore distinguishable because Sparks makes clear that COVID-19 was never found on its premises and that it has no reason to think the virus contaminated or damaged anything at the restaurant, let alone made it uninhabitable. Compl. ¶ 43 (explaining that coronavirus was not "found in or on [Sparks's] insured property"); Opposition at 18 ("[T]here is no allegation, and no evidence, that the virus existed on or at [Sparks's] property."); *id.* at 20 ("There has been no infestation or contamination of Sparks' property by coronavirus, nor are there any allegations that

would support such an assumption.").

Sparks relies heavily on *Port Authority of New York and New Jersey v. Affiliated FM Insurance Co.*, 311 F.3d 226 (3d Cir. 2002).  In that case, the plaintiff argued that the presence of asbestos in several of its buildings constituted a "physical loss or damage."  *Id.* at 230.  Although the Third Circuit recognized that "the presence of large quantities of asbestos in the air of a building [that] make the structure uninhabitable and unusable" can constitute a loss in certain circumstances, the court ultimately affirmed summary judgment in favor of the insurer because the buildings' functions were not "nearly eliminated or destroyed," but rather enjoyed "continuous and uninterrupted usage."  *Id.* at 236.  Thus, this case only further bolsters Admiral's argument for dismissal because Sparks fails to argue that its restaurant was "nearly eliminated or destroyed" because of the presence of COVID-19.  The other cases Sparks cites also do not support its position because they too involved situations in which the loss of use was a result of the presence of something harmful.  For example, in *TRAVCO Insurance Co. v. Ward*, 715 F. Supp. 2d 699, 701, 708-09 (E.D. Va. 2010), *aff'd*, 504 F. App'x 251 (4th Cir. 2013), the court held that a building had suffered a "direct physical loss" because it had been "rendered uninhabitable by the toxic gases released by the Chinese Drywall," but then went on to deny coverage anyway because four exclusions applied.  Other cases Sparks cites are distinguishable for similar reasons.  *See Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*, No. 12 Civ. 4418, 2014 WL 6675934, at *8 (D.N.J. Nov. 25, 2014) (holding that a juice plant incurred "physical loss of or damage to" its facility when ammonia gas was discharged into the plant's air and rendered the facility "unfit for occupancy"); *Sentinel Mgmt. Co. v. N.H. Ins. Co.*, 563 N.W.2d 296, 299 (Minn. Ct. App. 1997) (involving "asbestos contamination of [the plaintiff's] buildings").  These cases are therefore inapposite because nothing has contaminated Sparks's restaurant rendering it inaccessible.  Compl.

¶ 43

Indeed, the main COVID-19-related case that Sparks cites in its favor is distinguishable along these very lines as well.  In *Studio 417, Inc. v. Cincinnati Ins. Co.*, No. 20 Civ. 3127, 2020 WL 4692385, at *9 (W.D. Mo. Aug. 12, 2020), the court denied an insurer's motion to dismiss because plaintiff beauty salons and restaurants alleged that COVID-19 "attached to and deprived [p]laintiffs of their property, making it unsafe and unusable, resulting in direct physical loss to the premises and property."  *Id.* at *4 (internal quotation marks and citation omitted).  These plaintiffs thus "expressly allege[d] physical contamination."  *Id.* at *6.  Sparks does not.  *See also Mudpie, Inc.*, 2020 WL 5525171, at *6 (distinguishing *Studio 417* because the plaintiffs in *Studio 417* alleged that "the presence of the COVID-19 virus in its store created a physical loss," whereas the *Mudpie* plaintiffs only focused on closure orders, a "distinctly less physical phenomenon").[4]

None of the facts pleaded in the Complaint suggest that the suspension in Sparks's operation was "caused by direct physical loss of or damage to property."  Policy at 56.  Sparks therefore has failed to plead allegations that would entitle it to the requested declaratory relief as to the Policy's business income provision.  Nor has Sparks sufficiently alleged any breach of contract as to that provision.  Accordingly, Counts One and Two of the Complaint are dismissed.

**D.  Extra Expense Coverage**

Sparks also claims entitlement to extra expense coverage by alleging that it sustained expenses that it would not have incurred but for Sparks's closure.  Compl. ¶¶ 100, 105.  These claims necessarily fail for two reasons.  First, extra expense coverage only applies if business income coverage applies.  *See* Compl. ¶ 38; Policy at 56.  Because the Court concludes that business income coverage does not apply here, extra expense coverage does not either.  Relatedly,

---

[4] The insurance policy at issue in *Studio 417* did not contain a virus exclusion provision. *Studio 417*, 2020 WL 4692385, at *1.

extra expense coverage—like business income coverage—requires that Sparks suffer a "physical loss or damage to property."  Compl. ¶ 38; Policy at 56.  As detailed above, the Complaint fails to plead facts alleging such "physical loss or damage."  Therefore, because Sparks has not alleged sufficient facts with respect to the extra expense provision to establish the declaratory relief it seeks or to establish a breach of contract, Counts Five and Six of the Complaint are dismissed.

### E. Civil Authority Coverage

The Court next turns to Sparks's claim that it is entitled to coverage under the Policy's civil authority provision.  Compl. ¶¶ 85, 92.  As relevant here, this type of coverage requires Sparks to plead, *inter alia*, two prerequisites: (1) that there was "damage to property other than [its own]" and (2) that "action of civil authority [ ] prohibit[ed] access" to both Sparks and to the area immediately surrounding the damage.  Compl. ¶ 39; Policy at 57.  Because Sparks has not pleaded facts establishing either of these prerequisites, Sparks's claims related to civil authority coverage fail as well.

First, the Complaint fails to allege any specific damage to property near Sparks.  Instead, Sparks only vaguely alludes to the fact that the closure orders affected businesses besides itself. Compl. ¶ 30 (discussing "restaurants and bars" generally); Opposition at 16 ("For the same reasons set forth above regarding the loss of Sparks' own property caused by New York's Closure Orders, other property within one mile of Sparks' insured property was likewise damaged by those same Orders, and in response to the same dangerous condition, access to Sparks' property was prohibited.").

Other courts have repeatedly rejected such ill-defined assertions.  For example, a court in the Northern District of California rejected a similar claim by the owner of several Hawaiian stores subject to COVID-19 closure orders, holding that "[i]n the absence of any allegation that any

23

specific neighboring property to [plaintiffs' property] in Hawaii had actual coronavirus exposure, this coverage has not plausibly been triggered." *Water Sports Kauai*, 2020 WL 6562332, at *8 (emphasis omitted).  In another case in the Northern District of Georgia, the court dismissed a restaurant's claim for civil authority coverage, in part, because the plaintiffs did not identify "any particular property around their premises which was damaged by COVID-19 or had its access restricted by a civil authority." *Henry's La. Grill, Inc.*, 2020 WL 5938755, at *6; *see also Seifert*, 2020 WL 6120002, at *4 (rejecting a civil authority claim and explaining that "if a complaint does not plead facts alleging some actual contamination or damage to property to a neighboring property, then the complaint does not state a plausible claim to relief.").  So too here.  Without specific allegations that a neighboring property suffered "damage to property," the Complaint fails to state a claim that is plausible on its face as to Sparks's entitlement of civil authority coverage.

Second, even if Sparks had properly alleged that neighboring property suffered damage, the Complaint fails to allege that access was ever denied to Sparks or the area immediately surrounding the damaged neighboring property, two necessary prerequisites for this form of coverage.  *See* Compl. ¶ 39; Policy at 57.  Under the Policy, civil authority coverage would only apply if, among other requirements, a civil authority "prohibit[ed] access to [Sparks]" and prohibited "[a]ccess to the area immediately surrounding the damaged property."  Compl. ¶ 39; Policy at 57.  In *54th Street Ltd. Partners v. Fidelity and Guaranty Insurance Co.*, the Appellate Division held that a restaurant's claim for civil authority coverage was properly limited to two days on which "access to its premises was denied."  763 N.Y.S.2d 243, 244 (App. Div. 2003).  However, this coverage did not extend to later days when "vehicular and pedestrian traffic in the area was diverted" because during this time "access to the restaurant was not denied" since "the restaurant was accessible to the public, plaintiff's employees and its vendors."  *Id.*

Similar issues arose in the wake of the terrorist attacks of September 11, 2001.  In *Philadelphia Parking Authority v. Federal Insurance Co.*, a parking garage company located at Philadelphia International Airport sued for lost income stemming from a federal order grounding all airplanes.  385 F. Supp. 2d at 283.  The court granted the insurer's motion to dismiss because, although the order "may have temporarily obviated the need for [p]laintiff's parking services, it did not prohibit access to [p]laintiff's garages and therefore cannot be used to invoke coverage." *Id.* at 289.  The same was true in *Abner, Herrman & Brock, Inc. v. Great Northern Insurance Co.*, 308 F. Supp. 2d 331, 333 (S.D.N.Y. 2004).  There, the court held that a Manhattan broker-dealer was entitled to civil authority coverage from September 11, 2001 through September 14, 2001 because on those dates, access to the firm's Lower Manhattan office was completely prohibited by civil authority.  *Id.* at 336.  However, civil authority coverage did not apply during later dates when "pedestrian access was permitted, and public transit was available" even though "vehicular traffic was restricted."  *Id.* at 333.

Here, Sparks has not alleged that access was ever denied completely to the restaurant or to the area immediately surrounding any neighboring damaged property.  Nor does the Complaint allege that delivery workers, restaurant employees, or customers could not access the address. Instead, it only claims that the closure orders limited restaurants like Sparks to serve "take-out and delivery" items.  Compl. ¶ 30.  And the closure orders confirm this.  Motion to Dismiss, Exh. B, § 7 ("[E]stablishments serving food and/or drink (including restaurants, bars, and cafes) may remain open for the sole purpose of providing take-out or delivery service."); Opposition, Exh. C ("Any restaurant or bar in the state of New York . . . until further notice shall only serve food or beverage for off-premises consumption.").  The fact that Sparks could have continued to operate its restaurant in some capacity is fatal to Sparks's claims for civil authority coverage.

25

Sparks's response is that the closure orders "made it illegal for Sparks to allow patrons into its restaurant." Opposition at 16. However, Sparks fails to cite any authority to support the idea that this would trigger civil authority coverage. This novel theory is without merit because under the plain meaning of the Policy, if employees (but not patrons) were allowed access to the indoor portions of the restaurant, civil authority did not prohibit access. For example, a court in the Southern District of California dismissed a claim for civil authority coverage because "the complaint does not allege that any COVID-19 [c]ivil [a]uthority [o]rders prohibited [p]laintiffs from access to their business premises." *Pappy's Barber Shops, Inc.*, 2020 WL 5500221, at *6; *see also Sandy Point Dental*, 2020 WL 5630465, at *3 ("[W]hile coronavirus orders have limited plaintiff's operations, no order issued in Illinois prohibits access to plaintiff's premises."). Moreover, as noted above, the Complaint acknowledges that the closure orders did not extend to take-out orders and deliveries. Compl. ¶ 30. Access to non-Sparks employees therefore was not even restricted by the closure orders, as the restaurant remained permitted to process delivery and take-out orders.

The Complaint fails to plead that the area surrounding Sparks suffered damage or that a civil authority order completely barred access to Sparks and the area immediately surrounding any neighboring damaged area. As with the Policy's business income and extra expense provisions, Sparks has failed to allege sufficient facts to establish its entitlement to the sought declaratory relief or to present a plausible breach of contract claim as to the civil authority provision. Counts Three and Four are therefore dismissed.[5]

---

[5] Sparks fails to adequately plead entitlement to coverage under any of the three provisions at issue here. Therefore, the Complaint must be dismissed. Admiral also argues that, even if Sparks could establish entitlement to coverage, the virus exclusion, the ordinance or law exclusion, and the act or decision exclusion would bar coverage. Motion to Dismiss at 8-13. These exclusions only apply if entitlement to coverage under one of the Policy's provisions is first established. Because the Court concludes that Sparks fails to establish entitlement to coverage

**F. Other Claims**

Sparks brought this action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of itself and "all other persons similarly situated."  Compl. ¶ 49.  To the extent that Sparks sought class certification in its Complaint, *see id.* at 29, the Court does not reach this because the Court today grants the motion to dismiss as to all claims that Sparks brought.  *See id.* ¶ 52.

Finally, the Complaint noted in passing that it sought a declaratory judgment that the Policy "provides coverage for future civil authority orders that result in future suspensions or curtailments of business operations."  *Id.* ¶ 9.  The Court does not read the Complaint's declaratory judgment counts as seeking such relief, but instead understands them to focus on the closure orders already issued. *Id.* ¶¶ 62-68, 79-85, 94-100.  If Sparks meant to seek a declaratory judgment that the Policy also provides coverage for future orders, Sparks would not be entitled to such an advisory opinion by this Court.  *See Olin Corp. v. Consol. Alum. Corp.*, 5 F.3d 10, 17 (2d Cir. 1993).

### III.  Conclusion

For the foregoing reasons, Admiral's Motion to Dismiss, Dkt. 24, is GRANTED.  Sparks did not move this Court for leave to amend the Complaint, and, in all events, the Court finds that allowing leave to amend would be futile.  Therefore, the case is DISMISSED with prejudice.  The Clerk of Court is respectfully directed to close this case.

SO ORDERED.

Dated: December 11, 2020
       New York, New York

JOHN P. CRONAN
United States District Judge

---

under the Policy, it need not reach the question of whether these various exclusions would apply.